UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| JOHN BIANCHI, | : |
| Plaintiff, | : |
| v. | : CASE NO. 3:09-cv-1129 (HBF) |
| PRATT & WHITNEY, | : |
| Defendant. | : |

MEMORANDUM OF DECISION

Plaintiff John Bianchi brings this action against defendant Pratt & Whitney for an alleged violation of section 510 of the Employee Income Security Act ("ERISA"), 29 U.S.C. § 1140.[1] Because Pratt ultimately terminated plaintiff's employment, plaintiff was prevented from participating in the company's Salaried Employee Severance Plan for Voluntary Separation ("VSP"), thereby depriving plaintiff of the benefits offered under the VSP. Plaintiff seeks damages in the amount he would have received had he been allowed to participate in the VSP. A bench trial was held from November 13, 2012 through November 14, 2012.

---

[1] Plaintiff's initial Complaint [Doc. # 1] alleged a breach of contract and breach of covenant of good faith. Plaintiff later filed an Amended Complaint [Doc. # 18], alleging the ERISA violation and a count for negligent infliction of emotional distress. The district judge disposed of plaintiff's negligent infliction of emotional distress claim on summary judgment [Doc. # 60].

1

At the close of plaintiff's case, Pratt made an oral motion for judgment as a matter of law under Rule 50 of the Federal Rules of Civil Procedure. The Court construed Pratt's motion as a motion under Rule 52(c) of the Federal Rules of Civil Procedure, "which allows the court to enter judgment as a matter of law in the moving party's favor at any point in the proceedings when the non-moving party has been fully heard on an issue during a non jury trial and the court finds against the party." Fabricated Wall Sys., Inc. v. Herman Miller, Inc., No. 3:08-cv-01313 (SRU), 2011 WL 5374130, at *1 (D. Conn. Nov. 8, 2011) (citing Fed. R. Civ. P. 52(c); AmBase Corp. v. SDG Inc., No. 3:00CV1694(DJS), 2005 WL 1860260, at *2 (D. Conn. Aug. 3, 2005)). "A Rule 52(c) motion made by a defendant may be granted where the plaintiff has failed to make out a prima facie case or where the plaintiff has made out a prima facie case but the court determines that a preponderance of the evidence goes against the plaintiff's claim." Fabricated Wall Sys., 2011 WL 5374130, at *1 (citation and internal quotations omitted). Accordingly, "[t]he court's task on such a motion is to weigh the evidence, resolve any conflicts in it, and decide for itself where the preponderance lies… Rule 52(c) implies the same inquiry the court makes to resolve all of the legal and factual matters under Rule 52(a)." Id.

Three witnesses testified at trial: plaintiff; Joseph P. Muldoon, a current Pratt employee and formerly plaintiff's supervisor; and Philip W. "Chip" Simplicio[2], a former Pratt employee. After considering their testimony, as well as the documentary evidence, the Court granted on the record Pratt's oral motion for "judgment as a matter of law" [Doc. # 93], and found that plaintiff failed to prove Pratt's violation of Section 510 of ERISA by the preponderance of the evidence. Specifically, the Court found that plaintiff did not prove by a preponderance of the evidence that plaintiff's potential eligibility for VSP benefits played any role in Pratt's decision to terminate plaintiff's employment. In support of this ruling, the following constitutes the Court's findings of fact and conclusions of law pursuant to Rules 52(a) and (c).

---

[2] The Court received testimony from Simplicio, which was proffered by plaintiff for the purposes of establishing that Pratt treated other company employees more favorably with respect to employment termination decisions. Simplicio was previously employed by Pratt as an individual contributor, and not a manager. During his employment, Simplicio altered sales data in a sales database so that it appeared he made more sales than he actually did. This alteration did not affect Simplicio's compensation. Simplicio received a verbal warning in response to his misconduct. Muldoon testified as to the differences between Simplicio and plaintiff, that Simplicio, unlike plaintiff, was not in a management position, he openly admitted his misconduct and apologized for the same, and did not enlist his co-workers to partake in the misconduct. The Court accords little weight to Simplicio's testimony as it failed to establish that Simplicio and plaintiff were in any way similarly situated for purposes of comparing employment disciplinary decisions.

I.      **FINDINGS OF FACT**

Based on the credible testimony, the exhibits and the entire record developed during trial, the Court finds the following facts established.

A.      *PLAINTIFF'S BACKGROUND*

1. Plaintiff began working at Pratt in 1964, eventually working his way into management.

2. As a manager, plaintiff led the Tooling Support Services ("TSS") group and provided the day-to-day leadership of this group.

3. At the time of plaintiff's termination[3], he had 12 employees reporting directly to him.

4. At the time of his termination, plaintiff's direct supervisor was Grace Kong. Kong reported directly to Muldoon, who was then the General Manager of Pratt's Maintenance Data, Services & Equipment ("MDSE") organization. Although Kong became plaintiff's direct supervisor shortly before his termination, plaintiff reported directly to Muldoon for the majority of the time period leading up to his termination.

B.      *THE VOLUNTARY SEPARATION PROGRAM*

5. On July 18, 2008, Pratt announced the VSP, memorialized by a written document entitled Pratt & Whitney Salaried Employee

---

[3] The Court shall address the facts relating to plaintiff's termination in a subsequent subsection.

4

Severance Plan for Voluntary Termination ("VSP Document"). [Def. Ex. 533].

6. Pratt intended for the VSP to "fall within the definition of an employee welfare benefit under Section 3(1)" of ERISA. [Id.].

7. To be eligible to participate in the VSP, an employee must, *inter alia*, have been at least sixty (60) years of age and have had at least ten (10) years of continuous employment as of September 30, 2008. [Def. Ex. 533, Art. II, § 5(d)-(e)].

8. Generally, the last day of employment for Pratt employees electing to participate in the VSP was September 30, 2008 ("Separation Date"). [Id. at Art. II, § 10].

9. To be eligible for the VSP, in addition to the requirements set forth in Article II, Section 5 of the VSP Document, an employee had to remain in the continuous employ of Pratt, as an employee in good standing, through that employee's Separation Date. [Id. at Art. III, § 4].

10. A Pratt employee, otherwise eligible to participate in the VSP, would not receive VSP benefits if that employee was involuntarily terminated from employment before the Separation Date. [Id. at Art. III, § 5].

11. On or about August 7, 2008, plaintiff advised Muldoon by telephone of his intention to participate in the VSP. [Def. Ex. 522].

12. On August 28, 2008, plaintiff accepted the VSP by executing and returning by mail the Pratt & Whitney Separation Agreement and General Release. [Pl. Ex. 2].

13. When Pratt offered the VSP, 769 employees, including plaintiff, met the minimum age and service requirements to participate.

14. Excluding plaintiff, 346 employees elected to participate in the VSP, 139 of whom, like plaintiff, had 40 or more years of continuous service with Pratt.

15. Pratt paid approximately $21 million in severance payments and $3 million in transition payments, for a total of over $24 million, to the 346 VSP participants.

16. Had plaintiff been eligible to participate in the VSP, he would have been entitled to collect a lump sum severance payment of $112,900.82, plus a transition benefit of $10,000, less applicable taxes and withholdings.  [*Am. Jt. Trial Memo.*, Stipulation at ¶ 9, Doc. # 83 ("Stipulation")].

    **C.**    ***PRATT'S RULES, REGULATIONS AND POLICIES***

17. Pratt requires all of its salaried employees, including plaintiff, to complete one (1) Business Practices and Ethical Compliance ("BPEC") course per quarter, for a total of four (4) per year.  BPEC courses are employee-training courses that teach compliance obligations for Pratt's business processes and code of ethics.

18.  BPEC courses are taken online using an employee-specific username and password.  Once the online training is complete, the employee takes a mastery test on the training subject matter, certifying that the employee has read and understands the subject matter.  When the employee passes the mastery test, the online system creates an electronic certificate in the employee record system that the employee completed the BPEC course.

19.  Pratt's Code of Ethics provides, in pertinent part:

a. "We will respect the interests of employees in privacy and treat employees with dignity and respect." [Def. Ex. 502, at p. PW0006];

b. "UTC is committed to providing its employees… a work environment free from discrimination, harassment, or personal behavior not conducive to a productive work climate." [Id. at p.  PW0011]; and

c.  "Managers at all levels of UTC are responsible for creating and fostering a culture of ethical business practices, and instilling an awareness of and commitment to this *Code of Ethics*. Failure to comply with this *Code* or any of its requirements will result in appropriate discipline, up to and including discharge."  [Id. at p. PW0018] (emphasis in original).

20.  Section 1 of Pratt's *Supervisor's Policy Guide Employee Records – Access & Copying* states, "It is Pratt & Whitney's policy to maintain the privacy of employee records…" [Def. Ex. 502, § 1].

7

21. Section 1 of Pratt's *Supervisor's Policy Guide Harassment-Free Workplace Policy* states, "Harassment of any kind, including sexual harassment, has no place in Pratt & Whitney's environment and will not be tolerated."  [Def. Ex. 504, § 1].

22. Section 5.3 of Pratt's *Supervisor's Policy Guide Harassment-Free Workplace Policy* states, "The company recognizes that harassment is a serious matter and persons who engage in harassment will be subject to discipline up to and including termination of employment."  [Def. Ex 504, § 5.3].

23. Section 5.1K of Pratt's *Supervisor's Policy General Rules of Conduct* states that, "The following practices are strictly forbidden… falsifying any… data collection entry or Company record or giving false information to anyone whose duty it is to make such records…"  [Def. Ex. 505, § 5.1K].

24. Section 3C of Pratt's *Policy Statement 20 (Rev. 2)* dated June 1, 1999 on Electronic Communications/Pratt & Whitney Intranet provides that, "any attempt to gain unauthorized access to computer or network facilities of the Company, its affiliates or subsidiaries, or computers or networks belonging to others" and "unauthorized access of data or electronic communications not addressed to or sent by the user" are prohibited.  [Def. Ex. 506, § 3C].

### D.   THE HUMAN RESOURCES INVESTIGATION

25. On July 10, 2008, three of plaintiff's direct reports submitted a written complaint concerning plaintiff's conduct to Kong and Pratt's human resources department ("Complaint"). [Def. Ex. 507].

26. On July 11, 2008, Kong shared the Complaint with Muldoon, who directed Kong to forward the Complaint to Pratt's human resources manager Kate Keiderling[4] and to initiate an investigation into the Complaint's allegations.[5]

27. Pratt's human resources department thereafter initiated an investigation into plaintiff's alleged misconduct.

28. On July 11, 2008, Muldoon notified his superior, Warren M. Boley, of the Complaint via email, and stated, "My initial assessment is that the employee claims are credible and that these actions, if confirmed, will likely result in termination of [plaintiff]."  [Def. Ex. 508].

29. In a second email to Boley on July 11, 2008, Muldoon expressed concern with the specific allegations that plaintiff

---

[4] Kate Keiderling was formerly known as Kate McMahon.
[5] The processes noted in the Findings of Fact relating to the termination of plaintiff's employment, unless otherwise noted, are largely drawn from Muldoon's testimony.  The Court credits Muldoon's testimony concerning these matters.

9

directed employees to take his BPEC courses and to complete his Performance Feedback Tool [("PFT")][6] write-ups. [Def. Ex. 509].

30. On July 17, 2008, Muldoon sent emails to Kong and Keiderling with a chart listing potential disciplinary actions for plaintiff, depending on the outcome of the human resources investigation. [Def. Ex. 514]. This chart lists the following potential disciplinary actions: "[e]mployee remains in current supervisory role on EIP[7]"; "[e]mployee demoted to individual contributor within TSS organization"; "[e]mployee demoted to individual contributor within different MDSE organization"; and "[t]erminate [e]mployee". [Id.]. Muldoon credibly testified that at the time he created this chart, the investigation into plaintiff's alleged misconduct was not complete.

31. The court credits Muldoon's testimony that he first learned of the VSP via telephone on July 18, 2008, and again at a more formal briefing on July 21, 2008.

32. The investigation into plaintiff's conduct proceeded over several weeks. During this time, Pratt's human resources personnel interviewed several of plaintiff's direct reports regarding the Complaint's allegations.

---

[6] The PFT contains confidential employee information, including employee performance ratings.
[7] Muldoon testified that "EIP" stands for employee improvement plan.

33. As part of the investigation, on July 21, 2008, Keiderling and W. Dennis Aikin, Manager of Investigations and Security, interviewed plaintiff regarding the Complaint's allegations.

34. At the meeting on July 21, 2008, Aikin and Keiderling prepared a voluntary statement for plaintiff to sign, which summarized the findings of their interview with him. Plaintiff did not sign this statement. [Pl. Ex. 4; Def. Ex. 518].

35. On August 18, 2008, Muldoon met with plaintiff at a pre-scheduled meeting to discuss sale performance and succession planning for plaintiff's group.

36. Immediately following the August 18, 2008 meeting with Muldoon, plaintiff again met with Keiderling and Aikin, who suspended plaintiff pending the final outcome of the investigation.

37. During the course of the investigation into plaintiff's alleged misconduct, Deborah Morse, a sales associate in the TSS group, filed a complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO") against plaintiff. In the CHRO complaint, Morse alleged plaintiff committed gender discrimination and provided disparate pay to women.

38. Muldoon did not personally participate in the investigation of plaintiff's alleged behavior, but relied on information supplied to him by Keiderling at weekly meetings.

39. At the conclusion of the investigation, Keiderling and Muldoon attended a final meeting. At this meeting, Keiderling advised Muldoon that the findings of the employee interviews corroborated the Complaint's allegations, including: (a) that plaintiff directed a subordinate to complete his BPEC courses on his behalf; (b) that plaintiff provided multiple employees with his confidential log-in and password to gain access to plaintiff's computer; (c) that plaintiff made malicious comments to employees and enabled a hostile work environment to develop; and (d) that plaintiff enabled an employee to access the PFT system and gain access to confidential employee information.[8]

40. At this meeting, Keiderling additionally advised Muldoon that during the course of the investigation, plaintiff was uncooperative, provided false and misleading information to investigators, attempted to obstruct the investigation, and contacted a key witness to discuss differences in their statements, after being told by human resources not to do so.

41. Muldoon testified that plaintiff's corroborated misconduct constituted violations of Pratt's *Code of Ethics* [Def. Ex. 501], *Supervisor's Policy Guide Employee Records – Access & Copying* [Def. Ex. 502], *Supervisor's Policy Guide*

---

[8] Plaintiff admitted at trial that he provided certain employees with his login and password to his computer system so that they could complete his BPEC courses and input information into the PFT on plaintiff's behalf.

*Harassment-Free Workplace Policy* [Def. Ex. 504], *Supervisor's Policy Guide General Rules of Conduct* [Def. Ex. 505], and Pratt's *Policy Statement 20 (Rev. 2)* dated June 1, 1999 [Def. Ex. 506].

42. Muldoon testified that plaintiff's misconduct constituted severe violations of Pratt's policies because plaintiff: (a) enlisted subordinates to commit violations of Pratt's policies when he provided them with access to his computer systems and confidential employee information; (b) disclosed private and confidential employee information inappropriately, thereby eschewing his responsibility as a custodian of employee information; (c) fostered a hostile work environment; and (d) directed employees to perform his BPEC courses, which trivialized the importance of the BPEC courses and conveyed the message that compliance with the BPECs was not important.

### E. PLAINTIFF'S TERMINATION

43. The Court credits Muldoon's testimony that it was his decision to terminate plaintiff's employment and, in making the decision to do so, that Muldoon relied on the results of the human resources investigation communicated to him by Keiderling.

44. Muldoon advised Boley of his decision to terminate plaintiff's employment, and Boley concurred in the decision. Muldoon testified that he did not tell Boley of plaintiff's

decision to participate in the VSP because this did not factor into Muldoon's decision to terminate plaintiff's employment.

45. The court credits Muldoon's testimony that he made a "conscious decision" to exclude the VSP from his decision to terminate plaintiff's employment.

46. On August 29, 2008, Muldoon and Keiderling telephoned plaintiff to terminate his employment. During this call, Muldoon read plaintiff a letter ("Termination Letter"), which explained the termination. The Termination Letter reads, in pertinent part:

> The Company has now completed its investigation, and concluded that you actively engaged in repeated violations of the Code of Ethics, the Employee Records Policy, the IT Security Policy, the General Rules of Conduct and the Harassment Free Workplace Policy. In addition, the investigation also concluded that you exhibited a lack of candor and knowingly and willfully made false statements to Company investigators, and that you attempted to improperly influence the outcome of the investigation. Managers at all levels of UTC are responsible for creating and fostering a culture of ethical business practices, encouraging open communications and instilling an awareness of and commitment to this Code of Ethics. The Company takes all of these policies very seriously and your exercise of poor judgment in engaging in these activities constitutes significant violations of these Company policies. As a result of these events and your unsatisfactory supervisory practices, the Company is terminating your employment as of August 29, 2008.
>
> [Def. Ex. 535].

47. During the August 29, 2008 telephone call, Muldoon advised plaintiff that he would not be eligible for the VSP.

48. Plaintiff testified at trial that he thought he would be reprimanded or issued a written warning as a result of his misconduct.

II.     **CONCLUSIONS OF LAW**

1. Section 510 of ERISA prohibits an employer to "discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provision of an employee benefit plan… or for the purpose of interfering with attainment of any right to which such participant may become entitled under the plan…" 29 U.S.C. § 1140.

2. "An essential element of plaintiff's proof under [§ 510 of ERISA] is to show that an employer was at least in part motivated by the specific intent to engage in activity prohibited by § 510." Dister v. The Cont'l Group, Inc., 859 F.2d 1108, 1111 (2d Cir. 1988) (string citation omitted).

3. "This standard does not require the plaintiff to show that interference with ERISA rights was the sole reason for his discharge, but it does require him to show more than the incidental loss of benefits as a result of a discharge." Gandelman v. Aetna Ambulance Serv., Inc., 48 F. Supp. 2d 169, 172 (D. Conn. 1999) (citing Seaman v. Arvida Realty Sales, 985

F.2d 543, 546 (11th Cir. 1993), cert. denied, 510 U.S. 916, 114 S. Ct. 308, 126 L. Ed. 2d 255 (1993)); see also Lightfoot v. Union Carbide Corp., 110 F.3d 898, 906 (2d Cir. 1997) ("There is [ ] no cause of action under section 510 where the loss of pension benefits was a mere consequence of, but not a motivating factor behind, a termination of employment.") (citation and internal quotation omitted).

4.   The Second Circuit has adopted the analytical burden-shifting framework applied in Title VII employment discrimination claims set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05, 93 S. Ct. 1817, 1824-26, 36 L. Ed. 2d 668 (1973), as the model for evaluating claims made under § 510 of ERISA. Dister, 859 F.2d at 1112.

5.   Under the McDonnell Douglas frame work, a plaintiff must first establish a prima facie case of unlawful termination by establishing that (a) he falls within the protection of § 510 of ERISA; (b) he "was qualified for his position"; and (c) his employment was terminated, or other adverse action was taken, under "circumstances sufficient to give rise to an inference of discrimination." Id. at 1114-15.

6.   Based upon the testimony received and documentary evidence before the Court, it is apparent that plaintiff has established a prima facie case of unlawful termination. Notably, the record developed at trial reflects that (a) prior

16

to his termination, plaintiff was eligible for the VSP, a plan subject to ERISA; (b) plaintiff was well qualified for his position; and (c) Pratt terminated plaintiff a little more than a month prior to the occurrence of the employment eligibility date of September 30, 2008.

7. If the plaintiff succeeds in establishing a prima facie case of unlawful termination, the burden then shifts to the defendant, who must articulate, but not prove, a legitimate, nondiscriminatory reason for the challenged action.  Dister, 859 F.2d at 1115 (citing Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 254-56, 101 S. Ct. 1089, 1094-95, 67 L. Ed. 2d 207 (1981)).

8. The Court finds that Pratt has met its burden in articulating a legitimate and nondiscriminatory basis for terminating plaintiff's employment.  The record before the Court is replete with evidence of legitimate and nondiscriminatory reasons for terminating plaintiff's employment.  These reasons include, *inter alia*, plaintiff's "repeated violations of the Code of Ethics, the Employee Records Policy, the IT Security Policy, the General Rules of Conduct and the Harassment Free Workplace Policy." [Def. Ex. 535].

9. Because Pratt successfully articulated legitimate reasons for terminating plaintiff's employment, the burden shifts back to plaintiff to prove "by a preponderance of the

17

evidence that the reasons advanced [by defendant] are simply a pretext" to deprive plaintiff of ERISA benefits.  <u>Dister</u>, 859 F.2d at 1115 (citing <u>Burdine</u>, 450 U.S. at 256, 101 S. Ct. at 1095).

    10.  It is well established in the Second Circuit that "it is not the function of the fact-finder to second guess business decisions or to question a[n employer's] means to achieve a legitimate goal."  <u>Dister</u>, 859 F.2d at 1116; <u>Thompson v. Solis</u>, No. 09-3280-CV, 2010 WL 2134563, at *1, n.2 (2d Cir. May 28, 2010); <u>see also</u> <u>Ofoedu v. St. Francis Hosp. & Med. Ctr.</u>, No. 3:04cv1707(PCD), 2006 WL 2642415, at *18 ("Plaintiff's disagreement with the conclusions his supervisors drew from incidents that are admitted to have occurred is not evidence that the supervisor's appraisals are pretext, designed to mask discrimination… It is not the role of the Court to review or second guess the fairness or merit of Defendant's personnel and business decisions.") (citations omitted).

    11.  Based on the record before the Court, the Court finds that plaintiff has failed to meet his burden that Pratt, in terminating his position, was in any way motivated by the specific intent to deprive plaintiff of VSP benefits when it terminated his employment on August 29, 2008.  There is no evidence that Muldoon's decision to terminate plaintiff, on behalf of Pratt, was in any way motivated, or otherwise

18

influenced, by plaintiff's eligibility to participate in the VSP.  In coming to this conclusion, the Court credits the testimony of Muldoon, who emphatically denied that the VSP played any part in his decision to terminate plaintiff. Muldoon's testimony is further bolstered by the documentary evidence.  Indeed, in an email dated July 11, 2008, approximately one week prior to Muldoon's knowledge of the VSP, Muldoon advised his superior that if the Complaint's allegations were confirmed, it "will likely result in termination of [plaintiff]."  [Def. Ex. 508].  As previously discussed, the investigation into plaintiff's misconduct in fact corroborated the Complaint's allegations.  Additionally, in a chart created on July 17, 2008, one day before the announcement of the VSP, Muldoon presents termination as a possible disciplinary action for plaintiff.  [Def. Ex. 514].  The record fails to establish that the possibility of terminating plaintiff's employment only arose after the announcement of the VSP.  Simply, plaintiff has failed to present any evidence that Pratt's amply supported reasons for terminating his employment were in any way pretextual. See, e.g., Jensen v. Garlock, Inc., 4 F. Supp. 2d 219, 223 (W.D.N.Y. 1998) (By itself, "a lengthy period of an employee's satisfactory performance… is insufficient to suggest that an employer's amply supported reasons for terminating an employee are pretextual.").

19

**III.     CONCLUSION**

The Court finds that plaintiff failed to prove by a preponderance of the evidence that his potential eligibility for VSP benefits played any role in Pratt's decision to terminate plaintiff's employment on August 29, 2008. Accordingly, plaintiff has failed to prove that Pratt violated Section 510 of ERISA by a preponderance of the evidence. Therefore, judgment is entered in favor of defendant, Pratt & Whitney.

This is not a Recommended Ruling. The parties consented to proceed before a United States Magistrate Judge [Doc. # 78] on August 7, 2012 with appeal to the Court of Appeals. Fed. R. Civ. P. 73(b)-(c)

ENTERED at Bridgeport this 15th day of January 2013.

_____/s/_____
HOLLY B. FITZSIMMONS
UNITED STATES MAGISTRATE JUDGE